**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ESTATE OF OLUSEGUN-VICTOR
A. DARAMOLA,

        Plaintiff-Appellant,

v.

COASTAL MART, INC., a Delaware
Corporation; EL PASO
CORPORATION, a Delaware
Corporation,

        Defendants-Appellees.

No. 04-1016

(D. Colorado)

(D.C. No. 02-RB-319)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, **MURPHY**, and **McCONNELL**, Circuit Judges.

---

Victor Daramola filed this action against his former employer Coastal Mart,

Inc., challenging Coastal Mart's termination of his employment and its filing of a

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally
disfavors the citation of orders and judgments; nevertheless, an order and
judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

criminal complaint against him.[1] Mr. Daramola asserted a 42 U.S.C. § 1981 claim, alleging that he was terminated because of his race, and state law claims for malicious prosecution, outrageous conduct, and negligent supervision. Coastal Mart defended on the grounds that, during the period from April 1, 1999 to September 30, 1999, the convenience store managed by Mr. Daramola suffered a loss of 15,875 gallons of gasoline inventory, an under-reporting of 13,214 gallons of gasoline sales, and lost sales of $17,052. According to Coastal Mart, Mr. Daramola was discharged because he failed to account for these shortages.

The district court granted summary judgment to Coastal Mart. As to the § 1981 claim, the court reasoned that Mr. Daramola had provided no evidence that Coastal Mart's reliance on the gasoline and cash shortages as grounds for discharging Mr. Daramola was a pretext for discrimination. As to the state law malicious prosecution claim, the district court concluded that the criminal prosecution against Mr. Daramola was "instituted by and with the approval of the prosecuting attorney," Aplt's App. vol. III, at 885, and that Coastal Mart's suspicion of criminal wrongdoing was objectively reasonable. The court also rejected the claims for outrageous conduct and negligent supervision.

---

[1] Following the termination of Mr. Daramola's employment, Coastal Mart was purchased by El Paso Corporation. Because the events at issue in this appeal occurred before this purchase, we refer to Coastal Mart in our discussion.

In this appeal, Mr. Daramola challenges the district court's grant of summary judgment on the § 1981 and malicious prosecution claims. We agree with the district court that Mr. Daramola has failed to present evidence indicating that this determination was a pretext for racial discrimination or that the company lacked objectively reasonable grounds to file a criminal complaint. We therefore affirm the district court's grant of summary judgment to Coastal Mart.

I.  BACKGROUND

Mr. Daramola, a Nigerian-born African-American, worked as a manager of a Coastal Mart convenience store in Edgewater, Colorado from 1995 until February 17, 2000. During that time, he pursued an education, obtaining B.A. and M.A. degrees. In 2001, Mr. Daramola received a doctorate in international studies from the University of Denver.

Sometime in August, September, or October 1999, Mark Jaggard, a Coastal Mart Regional Vice-President, and Steve Sames, a Coastal Mart Zone Vice-President, became aware of a significant shortage of gasoline and cash from the Edgewater store managed by Mr. Daramola. In September of that year, Mr. Daramola himself reported that store records reflected a substantial shortage in gasoline, approximately 3,000 gallons. For several prior months, Mr. Daramola had reported problems with gas shortages in deliveries, power outages affecting

the gas pump console, and cash register problems. However, in deposition testimony, he was unable to quantify the amount of shortages that he had reported.

Mr. Jaggard and Mr. Sames asked Mr. Daramola's immediate supervisor, Area Sales Manager Celestino Molina, to investigate the shortages by reviewing the store's daily sales reports from April to September 1999. The daily sales reports documented gasoline sales for the previous day in gallons and dollars. The store manager calculated gasoline sales information through cash register reports, pump meters, and other data sources and recorded the information on the store's computer.

After reviewing the daily sales reports, Mr. Molina discovered that they reflected repeated under-reporting of the quantity of gasoline sold and total sales revenues. In particular, for April to September 1999, Mr. Molina found a total inventory loss of 15,875 gallons, an under-reporting of sales of 13,214 gallons, and lost sales of $17,052. The greatest losses were in September.

Mr. Molina and Mr. Sames concluded that Mr. Daramola was responsible for the shortages. They ruled out other possible explanations: the gas tanks were not leaking and the pump calibrations were within acceptable limits. Maintenance and repair records did show that, on approximately five occasions during this period, there were computer problems that required servicing. However,

according to Mr. Sames, the loss pattern documented by Mr. Molina could not be explained by these computer problems. Mr. Sames observed that, if computer or cash register malfunctions had caused the shortages, the shortages would have arisen on the day of the malfunction, not repeatedly over a six-month period.

Mr. Sames and Mr. Jaggard then sought the advice of Michael Melton, an official in Coastal Mart's security department. After conferring, the three men decided that Mr. Daramola should be fired.

On February 17, 2000, Mr. Molina called Mr. Daramola and told him to report to Mr. Molina's office to discuss overtime issues. Mr. Molina later admitted that this was not the real purpose of the meeting. However, he explained, it was not company policy to provide employees suspected of misconduct with advanced notice of the allegations against them.

Mr. Daramola and the Coastal Mart officials gave contrasting accounts of the February 17, 2000 meeting. According to the Coastal Mart officials, Mr. Molina and Mr. Melton informed Mr. Daramola at the beginning of the meeting that they were investigating significant shortages of gasoline and cash. They gave him a calculator and asked him how he had determined the gallons sold and the sales amounts for two dates in September. Mr. Daramola could not account for the shortages and admitted that the daily sales reports were mistaken. Mr. Melton asked Mr. Daramola what should happen to a store manager who consistently

-5-

under-reported sales, and Mr. Daramola stated that such a manager should be fired. The meeting lasted about an hour.

According to Mr. Daramola, the meeting unfolded much differently. He appeared at the meeting expecting to talk about overtime pay and was confused by the officials' attempts to discuss gas and cash shortages. He stated that the questions about the daily sales reports did not make sense to him and that he was informed of his termination within three to five minutes.

At the conclusion of the February 17, 2000 meeting, Coastal Mart officials provided Mr. Daramola with a written termination notice that stated that he had been fired for "not being responsible to take care of the [a]ssets of the [c]ompany" and for "improperly enter[ing] the gasoline information . . . [in] violation of a [c]ompany [p]olicy." Aplt's App. vol. II, at 362. On the same day, Mr. Melton contacted the Edgewater Police Department to report the loss of gas and cash at the store. Mr. Melton met with Officer Scott Fowle and told him that he should consult Mr. Molina and Mr. Sames about the company's investigation. On March 10, 2000, Officer Fowle met with Mr. Molina and Mr. Sames. Mr. Molina reported that Mr. Daramola had stolen money, and he provided Officer Fowle with the daily sales reports from April to September 1999.

Three days later, Officer Fowle met with Mr. Daramola. Mr. Daramola told him that the losses might be explained by computer and cash register

malfunctions, shortages during gasoline deliveries, fluctuating gas tank volumes caused by changes in temperature, and the incompetence of his direct supervisor, Mr. Molina. Mr. Daramola also provided a written rebuttal statement. Apparently, Mr. Daramola was not convincing, for Officer Fowle prepared an affidavit of probable cause, based on information provided by Mr. Molina. The Edgewater Police Department then issued a criminal complaint and an arrest warrant against Mr. Daramola. However, for reasons unclear from this record, Mr. Daramola was not arrested until over a year later, in April 2001.

The criminal case against Mr. Daramola was eventually dismissed. In the intervening months, Mr. Molina had relocated to Corpus Christi, Texas, and had begun working for a new employer. Although Mr. Sames remained in Littleton, Colorado, he too was no longer employed by Coastal Mart or its successor. As a result, the prosecuting attorney had difficulty locating and securing the cooperation of these witnesses at the time of the preliminary hearing.

Mr. Daramola then filed this action against Coastal Mart, alleging: (1) a racial discrimination claim under 42 U.S.C. § 1981; (2) a state law claim for malicious prosecution; (3) a state law claim for outrageous conduct; and (4) a state law claim for negligent supervision of Mr. Molina. The district court granted summary judgment to Coastal Mart on all of these claims.

Tragically, Mr. Daramola suffered a stroke and died in August 2003. His estate is now prosecuting this appeal.

## II. DISCUSSION

On appeal, Mr. Daramola challenges the district court's grant of summary judgment to Coastal Mart on his § 1981 racial discrimination claim and his state law malicious prosecution claim. We review the grant of summary judgment de novo, applying the same legal standard used by the district court. Jaramillo v. Colo. Jud. Dep't., 427 F.3d 1303, 1307 (10th Cir. 2005). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, we view the evidence in the light most favorable to the non-movant. Jaramillo, 427 F.3d at 1307.

### A. Section 1981 Claim

Mr. Daramola asserted a racial discrimination claim under 42 U.S.C. § 1981, which states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all

laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute applies to discrimination by non-governmental entities like Coastal Mart. Id.

This circuit has held that "[s]ection 1981 plaintiffs may prove discrimination circumstantially under the familiar burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1134 (10th Cir. 2004). Under that framework, the plaintiff has the initial burden of presenting a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802.

In order to establish a prima facie case, a plaintiff challenging his discharge from employment must establish that: (1) he belongs to a protected class; (2) he was qualified for the job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir. 1999). "[T]he prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

Here, there is no dispute that Mr. Daramola has established a prima facie case of racial discrimination. Thus, the inquiry turns to a second phase: the

employer must offer some nondiscriminatory reason for the employee's discharge. McDonnell Douglas, 411 U.S. at 802. If the employer satisfies this burden of production, the plaintiff must show that the reason proffered by the defendant is pretextual. Id. at 804.

"A plaintiff can show pretext by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir. 2002) (quotation and alteration omitted). The relevant inquiry is not whether [the defendant employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." Rivera v. City and County of Denver, 365 F.3d 912, 924 (10th Cir. 2004) (quotation marks omitted). However, "[t]here may be circumstances in which a claimed business judgment is so idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination." Beaird v. Seagate Tech., 145 F.3d 1159, 1169 (10th Cir. 1998).

"[E]vidence of pretext may include, but is not limited to, the following: prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria."

Garrett, 305 F.3d at 1217 (internal quotation marks and citations omitted).  A showing that the employer's justifications for its behavior are pretextual permits a finding of intentional discrimination, but does not compel it.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000).

1.  Mr. Daramola's Pretext Arguments

Mr. Daramola argues that there is evidence in the record indicating that Coastal Mart's stated reasons for his discharge—"not being responsible to take care of assets of the company" and  "improperly enter[ing] the gasoline information [in] violation of a company policy," Aplt's App. vol. II, at 362, were pretexts for racial discrimination.  Thus, he maintains, he is entitled to a jury trial on his § 1981 claim.

Mr. Daramola invokes (a) alleged inadequacies in Coastal Mart's pre-discharge investigation of the suspected shortages; (b) alleged procedural irregularities in the discharge proceedings; (c) varying explanations of the reasons for his discharge; (d) indications that he was treated differently than non-minority employees suspected of similar misconduct; and (e) evidence that Coastal Mart discriminated against him and against other African-Americans.

a.  Inadequacy of the pre-discharge investigation

-11-

Mr. Daramola contends that Coastal Mart's investigation of the suspected shortages was inadequate. He observes that Coastal Mart conducted six audits of Mr. Daramola's store from April to September 1999 and that none of these audits found the significant shortages. Mr. Daramola further contends that the shortages that Coastal Mart supervisors did find were caused by a malfunctioning of the computer system during the relevant period. He also contends that Coastal Mart supervisors failed to use several straightforward investigative measures. For example, he notes, they could have reviewed surveillance videos from Mr. Daramola's store and they could have interviewed employees who worked with him. Additionally, he asserts, the Coastal Mart supervisors disregarded Mr. Daramola's own reporting of shortages at the store. Finally, Mr. Daramola contends that Mr. Molina, his immediate supervisor, was not a credible witness, and that Coastal Mart's reliance on his accusations was not reasonable and therefore constituted evidence of pretext.

We begin with the six audits from April to September 1999. Coastal Mart submitted testimony from Mr. Sames that these audits were devoted to counting current inventory and that the auditor did not review past daily sales reports to determine whether there were shortages from the prior audit. Mr. Melton, Coastal Mart's security officer, provided similar testimony, explaining that these six

audits would be useful only if a loss occurred on the day of the audit. He added that on the days of these six audits, no shortages were found.

On this point, Coastal Mart's written audit policy supports the testimony of Mr. Sames and Mr. Melton. The policy states that "[a]uditors will stick all fuels tanks and read all pump meters and verify that the correct readings are entered into the Telxon by the Store Manager." Aplt's App. vol. II, at 289. However, there is no indication that the auditor is required to review past daily sales reports.

Mr. Daramola points to the deposition testimony of Mr. Jaggard, Coastal Mart's Regional Vice-President. Mr. Jaggard acknowledged that "the auditor was supposed to check both the numbers on the cash register and well as the [daily sales report]" and that "[i]f the auditor did what he was supposed to do, it should have popped up that there was a problem." Id. at 508.

However, for several reasons, these isolated statements do not undermine Coastal Mart's characterization of the audits. First, in Mr. Jaggard's acknowledgment that the auditor should review the daily sales report, there is no indication that he or she should review past daily sales reports, as Mr. Molina subsequently did. Moreover, even if one reads Mr. Jaggard's deposition to state that the auditor should have reviewed the past daily sales reports, there is no indication that the auditors actually did so here. Accordingly, the fact that

Coastal Mart did not rely on the six regular audits of Mr. Daramola's store does not support his contention that Coastal Mart's pre-discharge investigation was inadequate.

We reach the same conclusion as to the alleged computer and cash register malfunctions. Mr. Daramola contends that, in March of 1999, his store began experiencing problems with the computerized system used to record gasoline sales. He further notes that he reported problems with the store's cash register on a regular basis, a fact that Mr. Molina acknowledged in his deposition testimony. The record also indicates that on four occasions in 1999, computer technicians made service calls to repair equipment. See id. at 358-59. Moreover, an auditor reported that "[i]n late August of 1999, the computerized system for tracking sales and volume of gasoline went 'haywire.'" Aplt's Br. at 5 (quoting Aplt's App. vol. II, at 549).

Despite these allegations, we note that Mr. Daramola has failed to quantify the problems in record-keeping that could have been caused by these malfunctions. Moreover, Coastal Mart has presented testimony from Mr. Sames indicating that the equipment problems invoked by Mr. Daramola could not have caused the large shortages at his store. In particular, the service record of the computer repair company indicate service calls to Mr. Daramola's store on June 3, June 25, July 26, and August 23. Yet the shortages reflected in the daily sales

reports occurred on a regular basis throughout this period. Even as to the incident in August 1999 when the system went "haywire," Coastal Mart notes, the daily sales reports for the subsequent thirteen days indicate a total shortage of only about 140 gallons, with eleven days indicating no shortages at all. Thus, the fact that the Coastal Mart supervisors did not view the equipment problems as a plausible explanation of the shortages was not "so idiosyncratic or questionable" to constitute evidence of pretext. Beaird, 145 F.3d at 1169.

Coastal Mart's failure to make other inquiries as to the possible causes of the shortages is also not sufficient evidence of pretext to undermine the district court's grant of summary judgment. There is little doubt that Coastal Mart could have been more thorough in its pre-discharge investigation, consulting in-store videotapes and bank records and interviewing employees of Mr. Daramola's store. However, even accepting Mr. Daramola's views about the lack of thoroughness of the investigation, the evidence is not sufficient to indicate pretext. See Rivera, 365 F.3d at 924 (observing that the employer's reasons for the challenged action need not be "wise, fair or correct," as long as the employer "honestly believed those reasons and acted in good faith upon those beliefs") (internal quotation marks omitted); Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997) (stating that "a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination") (quotation marks

omitted).  Moreover, Coastal Mart offered unrebutted evidence that the investigative strategies  proposed by Mr. Daramola would not necessarily have uncovered the suspected misconduct.  For example, Mr. Sames testified that the fact that the bank deposits were not short would not exonerate a store manager because the store manager could always reconcile the amount he reported to the bank deposits.

For similar reasons, the fact that Mr. Daramola himself reported gasoline shortages to Coastal Mart supervisors does not constitute evidence of pretext.  Mr. Daramola did report a 3000 gallon shortage in September, but the monthly shortage revealed by the daily sales reports was considerably greater (approximately 5500 gallons).  Moreover, aside from the September shortages, Mr. Daramola has not offered even an approximation of the amount of shortages he previously reported.  Accordingly, absent more specific evidence, he has not shown that Coastal Mart's reliance on the daily sales reports to determine the amount of shortages was unreasonable or done in bad faith.

Mr. Daramola's final challenge to Coastal Mart's investigation is equally unconvincing.  Although he attacks Mr. Molina's credibility, he ignores the fact that Coastal Mart's allegations were supported by more than Mr. Molina's statements—in particular, the daily sales reports over a six-month period and Mr. Daramola's failure to offer a convincing explanation of the shortages.  Moreover,

Coastal Mart did not rely solely on Mr. Molina.  In October 1999, Coastal Mart received a "statistical inventory reconciliation report" regarding the store managed by Mr. Daramola.  The report noted that the store's "inventory records appear to be inaccurate[,]" that "[a]ll tanks at this site demonstrate the same loss pattern[,]" and that "[t]his may be caused by either a procedural error or clerical errors."  Aplt's App. vol. I, at 157.

We therefore conclude that these alleged deficiencies in Coastal Mart's investigation are insufficient to permit a reasonable factfinder to conclude that Coastal Mart's business reasons for terminating Mr. Molina's employment were a pretext for racial discrimination.

b.  Procedural irregularities

Invoking the principle that "disturbing procedural irregularities" may constitute evidence of pretext, see Garrett, 305 F.3d at 1217, Mr. Daramola contends that Coastal Mart supervisors (i) did not talk to him during the course of the investigation; (ii) did not afford him an adequate opportunity to defend himself; (iii) did not adequately investigate the cause of the reported shortages; (iv) did not engage in progressive discipline; (v) reported him to the police without first consulting the Employee Relations Department and the Legal Department, as required by company policy; and (vi) failed to inform the police of

several facts, including his excellent job history, the fact that he had reported shortages himself, or that, at the state unemployment hearing, a Coastal Mart official had stated that the company had no direct evidence of theft. Mr. Daramola maintains that these allegedly flawed procedures are sufficient to support an inference of pretext by a factfinder.

As to all but the fifth alleged irregularity, Mr. Daramola has failed to establish that a Coastal Mart policy was violated. In particular, although it is undisputed that Coastal Mart supervisors did not discuss their concerns about shortages with Mr. Daramola before the February 17 meeting, Mr. Daramola has identified no company policy that required such advanced notice. Moreover, at that meeting, Mr. Daramola was afforded an opportunity to respond to his supervisors' concerns. As to the alleged deficiencies in the pre-discharge investigation, we have previously explained why Coastal Mart's reliance on the daily sales reports rather than other sources was not "so idiosyncratic or questionable" to support a finding of pretext, Beaird, 145 F.3d at 1169.

With regard to the lack of progressive discipline, we note that Coastal Mart's policy is more flexible than Mr. Daramola suggests. The policy establishes "overall guidelines for employee discipline" but adds that it "is not intended to confer any rights for employees," that "[s]upervisors are encouraged but are not required to follow the guidelines," and that "[v]arying circumstances

-18-

may result in discipline more or less severe than outlined above." Aplt's App. vol. II, at 386. Moreover, the policy further provides that "there are some acts which normally should result in <u>immediate termination</u> on the first offense," and it includes the following example of that category of misconduct: "[i]ntentional or unintentional acts which could result in . . . significant property loss or damage." <u>Id.</u> at 385. In light of these provisions, we cannot agree with Mr. Daramola's contention that the decision to discharge him for failure to account for substantial amounts of gasoline and cash constituted a violation of Coastal Mart's progressive discipline policy. <u>See</u> <u>Jaramillo</u>, 427 F.3d at 1312-13 (concluding that because a state agency's rules did not require the administration of a formal examination, its failure to do so was not a "procedural irregularity" that could support an inference of pretext); <u>Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1329 (10th Cir. 1999) (concluding that alleged procedural irregularities in the defendant employer's hiring process did not support an inference of pretext because the plaintiff failed to show the process used by defendant was inconsistent with published policies).

Similarly, Mr. Daramola had failed to offer evidence that Coastal Mart supervisors' failure to inform the police of certain facts violated a particular company policy or constituted the kind of procedural irregularity that would support an allegation of pretext. As we have noted, the supervisors informed the

police of the key circumstances surrounding Mr. Daramola's discharge—the shortages of gas and cash—and they provided documents reflecting those shortages. In light of the information that they did provide, the failure to provide further information does not support Mr. Daramola's allegations of discrimination.

Finally, we note that Coastal Mart has not disputed Mr. Daramola's allegation that reporting him to the police without first consulting the Employee Relations Department and the Legal Department constituted a violation of company policy. However, for several reasons, we conclude that this violation is insufficient to support his claim of pretext. First, this violation of company policy occurred after Mr. Daramola had been discharged. It is thus distinguishable from the procedural irregularities that we have deemed sufficient. Compare Jaramillo, 427 F.3d at 1314-15 (discounting alleged procedural irregularities that occurred after the challenged personnel decision) with Plotke v. White, 405 F.3d 1092, 1104 (10th Cir. 2005) (discussing the fabrication of documents used to support a termination decision); and Garrett, 305 F.3d at 1219-20 (discussing procedural irregularities in work performance evaluations); and Simms, 165 F.3d at 1328 (listing "falsifying or manipulating hiring criteria" as examples of "disturbing procedural irregularities"); see generally Rea v. Martin Marietta Corp., 29 F.3d 1450, 1459 (10th Cir. 1994) (acknowledging that certain

procedural irregularities may be insufficient to warrant an inference of pretext).

Moreover, the information that Coastal Mart supervisors reported to the police (without first consulting the Employee Relations and Legal Departments) was neither false nor misleading: it consisted primarily of the records documenting the shortages at Mr. Daramola's store. Thus, the district court did not err in discounting this alleged evidence of pretext.

c. Varying explanations of the reasons for the discharge

Mr. Daramola argues that Coastal Mart's varying explanations for his discharge constitute evidence of pretext. He notes that in the February 17, 2000 notice, Coastal Mart stated that he had been discharged for "not being responsible to take care of the [a]ssets of the [c]ompany" and for "improperly enter[ing] the gasoline information [in] violation of a [c]ompany [p]olicy." Aplt's App. vol. II, at 362. However, Mr. Melton then filed a complaint with the district attorney's office, and Mr. Molina and Mr. Melton told Detective Fowle that Mr. Daramola had stolen cash. Subsequently, Mr. Daramola notes, a Coastal Mart representative stated at a state unemployment hearing that the company had no direct evidence of theft.

We agree with Coastal Mart that these varying explanations do not rise to the level of the subjective evaluations, see Garrett., 305 F.3d at 1219, or "glaring

-21-

contractions," see Cole v. Ruidoso Mun. Schools, 43 F.3d 1373, 1380 (10th Cir. 1994), warranting an inference of pretext. As the district court observed, the issue here is the reason that Mr. Daramola was fired, not the strength of the criminal case against him. As to the discharge decision, Coastal Mart relied on the shortages in the daily sales reports. The fact that Coastal Mart personnel drew different inferences about the question of theft does not undermine the reliance on the shortages as the justification for the company's employment decision.

d. Disparate treatment

Mr. Daramola also points to the manner in which five other employees, all of them Caucasian, were discharged. He contends that four of those employees were confronted with the company's allegations at their own store and were thus afforded the opportunity to refer to the relevant records. Moreover, he continues, each of these employees was given final warning before termination. Finally, in each case, the company obtained the assistance of an auditor during the investigation.

As to the fifth employee, Sue Thornton, Mr. Daramola contends that she too received more pre-discharge procedural protections than he did. In his view, the investigation of Ms. Thornton was much more thorough, she was afforded an

adequate opportunity to defend herself before she was fired, and all the relevant records were disclosed to the police.

Even accepting Mr. Daramola's allegations of these differences in treatment as true, we are not convinced that there is evidence of pretext raising a factual dispute as to the reason for his discharge. As Coastal Mart observes, the first four employees were not similarly situated: they were held responsible for much smaller shortages ($300 to $1,400). Accordingly, the fact that, unlike Mr. Daramola, they were given warnings before they were terminated is entitled to little weight. See Kendrick, 220 F.3d at 1233 (observing that "[a] company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct" and that "[o]ur role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments") (internal quotation marks omitted). Additionally, even though Mr. Daramola suggests that, unlike these Caucasian employees, he was not allowed to defend against the allegations by referring to the records at his own store, he has failed to explain what additional records would have been relevant. Significantly, neither in his post-discharge response to Coastal Mart nor in his interview with Officer Fowle did Mr. Daramola refer to records available at his store that would exonerate him. Finally, the fact that Coastal Mart eventually terminated these Caucasian employees for shortages

much less than those at issue here undercuts Mr. Daramola's contention that his discharge was a pretext for discrimination.

As to Ms. Thornton, Coastal Mart properly notes that there are similarities to this case: both Ms. Thornton and Mr. Daramola were the subject of internal investigations and both were discharged and referred to the police for possible criminal prosecution. However, Ms. Thornton was suspected of misappropriating a substantially greater amount of assets—approximately $216,000. Thus, the fact that Coastal Mart's investigation was more elaborate does not support the inference of pretext. See EEOC v. Flasher Co., 986 F.2d 1312, 1319-20 (10th Cir. 1992) (observing that differences in employment practices are often insufficient to establish pretext).

e. Direct evidence of discrimination

Mr. Daramola also contends that there was evidence that Coastal Mart discriminated against African-American employees. He reports that Mr. Molina offered his wife and daughter only a ten-cents-an-hour raise and that when he complained to Mr. Molina, Mr. Molina said, "After all, they are your people." Aplt's App. at 437. According to Mr. Daramola, around the same time, Mr. Molina gave a fifty-cents-an-hour raise to a white employee at another store.

Again, we conclude that even accepting Mr. Daramola's allegations as true, these differences in treatment are not sufficient to constitute evidence of pretext. The alleged salary differences are not related to the dispute at issue here. Similarly, the alleged "your people" remark, though presumptively offensive, was "an isolated comment[], unrelated to the challenged action," and therefore "insufficient to show discriminatory animus." Minshall v. McGraw Hill Broad. Co, 323 F.3d 1273, 1281 (10th Cir. 2003) (internal quotation marks and alterations omitted).

In summary, we conclude that none of the evidence invoked by Mr. Daramola permits a reasonable juror to conclude that the reasons given by Coastal Mart for his termination were "so idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination." Beaird, 145 F.3d at 1169. We have little doubt that Coastal Mart could have been more thorough in investigating the shortages and it could have given Mr. Daramola more time to prepare a defense before it terminated him. But those observations do not raise factual issues as to Mr. Daramola's § 1981 claim. Cf. Kariotis, 131 F.3d at 678 (stating that evidence that "the company's investigation was . . . impulsive and shoddy" was insufficient to raise issue of pretext).

B. Malicious Prosecution Claim

Mr. Daramola also argues that the district court erred in granting summary judgment to Coastal Mart on his malicious prosecution claim, asserted under Colorado law. In order to establish this claim, Mr. Daramola was required to prove the following elements: (1) that a criminal action was instituted against him; (2) that Coastal Mart caused the institution of the criminal action; (3) that the criminal case terminated in favor of Mr. Daramola; (4) that probable cause to file the criminal complaint was lacking; (5) that Coastal Mart acted with malice; and (6) that he was damaged by the institution of criminal proceedings. See Lounder v. Jacobs, 205 P.2d 236, 238 (Colo. 1949). Here, the district court found that a rational juror could not find for Mr. Daramola as to the second, fourth, or fifth elements.

Mr. Daramola now challenges that conclusion. He reurges the argument that Coastal Mart's investigation of the gas and cash shortages was incomplete. He maintains the Coastal Mart supervisors misled the police department and the prosecutor by providing them with incomplete and inaccurate information and thereby causing criminal charges to be filed without probable cause. The evidence he invokes is essentially the same evidence he invokes in support of his § 1981 claim.

In assessing this argument, we focus on the fourth element necessary to establish a malicious prosecution claim—that probable cause to file the criminal

complaint was lacking. The Colorado Supreme Court has defined probable cause as "a belief held in good faith by the prosecutor in the guilt of the accused, and that such belief be reasonable and prudent." Montgomery Ward & Co. v. Pherson, 272 P.2d 643, 646 (Colo. 1954); see also People v. Treat, 568 P.2d 473, 474-75 (Colo. 1977) ("The probable cause standard requires evidence sufficient to induce a person of ordinary prudence and caution conscientiously to entertain a reasonable belief that the defendant may have committed the crimes charged."). "The defendant in a suit based on malicious prosecution may have probable cause for the filing of the charges even though subsequent events may prove such charges to be erroneous." Id.

Here, the evidence upon which Coastal Mart relied in discharging Mr. Daramola indicates that the district attorney had probable cause to file criminal charges against him. As we have noted, Coastal Mart introduced evidence that the daily sales reports for Mr. Daramola's store indicated substantial shortages in gas and cash at Mr. Daramola's store from April through September 1999. Coastal Mart also introduced evidence that the explanations offered by Mr. Daramola for the shortages were unconvincing. Additionally, Detective Fowle stated that upon interviewing Mr. Daramola, he too found his explanations unconvincing. Although the prosecution against Mr. Daramola was eventually dismissed, that fact is not inconsistent with the district attorney's initial probable

cause determination. See id. Moreover, Mr. Daramola has introduced no evidence indicating that this eventual dismissal of the charges renders the daily sales reports any less reliable as documentation of the shortages at Mr. Daramola's store.

In light of the evidence supporting the filing of criminal charges, no reasonable juror could find the lack-of-probable cause element necessary to support a malicious prosecution claim under Colorado law. Thus, the district court's grant of summary judgment to Coastal Mart was proper.

Like the district court, however, we note that

> [b]y . . . finding [objectively reasonable both Coastal Mart's suspicion of wrongdoing and Detective Fowle's affidavit of probable cause] the court is not intimating it has concluded that [Mr.] Daramola is guilty of the crimes alleged. The court specifically finds that [Mr.] Daramola cannot be deemed guilty of a criminal offense in the posture of this case or the dismissed criminal case. It is not unheard of that objectively reasonable suspicions of criminal conduct are later determined to be unfounded.

Aplt's App. vol. III, at 529.

## III. CONCLUSION

Accordingly, we AFFIRM the district court's grant of summary judgment in favor of Coastal Mart and against Mr. Daramola.

Entered for the Court

-28-

Robert H. Henry
Circuit Judge